IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William F. Hayes,                                          Case No. 3:14 CV 2051

                              Plaintiff,                   MEMORANDUM OPINION
                                                           AND ORDER
                -vs-
                                                           JUDGE JACK ZOUHARY
State Central Bank, et al.,

                              Defendants.


### INTRODUCTION

The parties to this case ask this Court to determine the rightful owner of an airplane.  Plaintiff William Hayes, a lawyer and self-described "aviation law expert," claims he bought the plane fair and square from William Crews, the owner of Skymaster Center, Inc. and *allegedly* the duly authorized agent of Defendant State Central Bank (the "Bank").  The Bank claims it had preliminary talks with Crews about selling the plane but never authorized him to do so.  Those talks nonetheless prompted Crews to advertise the plane for sale, and at a price never agreed upon by the Bank.  The ad caught Hayes' eye and he called Crews to inspect the plane.  Hayes liked what he saw, bought the plane from Crews, and later flew it home from Iowa to Ohio.  That is, he thought he bought it, but he never received a bill of sale.  As it turns out, the Bank was unaware Crews was marketing the plane.  Crews disappeared with Hayes' money.

Hayes brought this action against the Bank to obtain a bill of sale and confirm the purchase.  The Bank countersued, arguing the plane was not Crews' to sell and asking this Court to order Hayes

to give back the plane.  The parties agreed to submit this matter on the briefs (Docs. 53, 55, 57–58).  And now, for the rest of the story.

### FINDINGS OF FACT

The Bank purchased a Cessna Skymaster airplane (the "plane") in 1970, and was the rightful and lawful owner at all times prior to its purported sale to Hayes (Doc. 52 at ¶¶ 5, 8).  The Bank, through Board of Directors Chairman William Logan, Sr., contacted Crews on March 2, 2014, to discuss the possibility of brokering a sale of the plane (Doc. 52 at 1; Doc. 55-2 at 2).  Crews owned and operated Skymaster Center, which provided marketing and brokerage services for buyers and sellers of Cessna aircraft (Doc. 52 at 2).

Crews received specific details about the plane from Logan.  Observing that the "market is so soft it's not funny," Crews suggested the Bank list the plane for $40,000, with Crews taking a $5,000 commission (Doc. 53-4 at 2).  Logan agreed with the commission price, but rejected the suggested sale price, replying "we can wait awhile [sic] till the market improves and the sun shines" (*id.*).  In the meantime, Logan suggested Crews consider "get[ing] the word around through [his] channels" that the plane might be coming up for sale (*id.*).  Crews wrote on March 12 that he would "get going on this" (*id.*).  Crews and the Bank never reached an oral agreement or signed a written agreement to broker a sale of the plane.

Contrary to Logan's instruction to wait, and without the Bank's knowledge, Crews advertised the plane on Skymaster Center's website with pictures, a description, and a $39,500 price tag -- a price even lower than the one Logan earlier declined (Doc. 55-4 at 2–3).  On March 17, Hayes contacted Crews about the plane.  Hayes tentatively agreed to the listing price and immediately mailed Crews a $5,000 deposit (Doc. 53-1 at 11; Doc. 55-5 at 2).  Two days later, Crews sent Hayes a

2

Purchase Agreement that identified Skymaster Central as the seller and did not even mention the Bank (Doc. 55-1 at 2–3).  The Purchase Agreement warranted that Skymaster Central held legal title to the plane (*id.*), although Hayes knew through his conversations with Crews that Skymaster Central "was merely a broker and did not own the Airplane" (Doc. 52 at ¶ 9; Doc. 53-1 at 11).  Notwithstanding this significant inconsistency, Hayes signed the Purchase Agreement (Doc. 53-5 at ¶ 14).

On March 30, Hayes traveled to Iowa for an inspection at Lindner Aviation, the hangar where the plane was stored.  Greg Gobble, the owner of Lindner Aviation and the plane's longtime mechanic, assisted in the inspection.  Hayes notified Crews that the inspection was satisfactory and promptly wired the remaining balance of $34,500 to Crews on April 2 (Doc. 53-5 at 4).  Crews confirmed the money transfer in an email to Hayes' wife, informing her that he was "[t]rying to get the Bill of Sale from Mr. Logan" (Doc. 53-6 at 2). The record suggests Crews never visited the airfield or met Hayes in person (*see, e.g.*, Doc. 53-1 at 9).

Having already executed the Purchase Agreement and received payment in full, Crews emailed Logan on April 3 identifying Hayes for the first time (Doc. 53-7 at 3).  Crews asked Logan when the Bank's Board of Directors was meeting to consider Hayes' offer; Crews claimed he was "really in a bind with my customer due to this misunderstanding" (*id.*).  The record does not reflect what Crews meant by "this misunderstanding," but certainly one interpretation is that Crews had no authority to sell the plane without the Bank's approval and failed to advise Hayes of this fact.  Logan replied on April 7, explaining that he would need a signed purchase offer and a valuation to "submit for approval" (Doc. 53-8 at 2; Doc. 55-2 at 5).  Crews sent a signed offer letter -- but not the executed Purchase Agreement -- and agreed to get a plane valuation together in "a couple days" (Doc. 53-8 at 2). Crews expressed his view that Hayes' offer was "very fair," but said he understood Logan "ha[d]

3

a board to deal with" (*id.*).  The record suggests Crews never followed up with the requested documents, as there are no emails from Crews to that effect and the Board did not discuss the plane at its April meeting (Doc. 55-16 at 39–43).

Nothing in the record suggests Hayes knew about this back-and-forth between Crews and the Bank.  Thus, while Crews attempted to get the Bank's approval, Hayes repeatedly requested Crews provide him a bill of sale.  But Crews stopped returning Hayes' phone calls after April 9 or 10; Hayes described Crews as having "gone underground" around this time, which is consistent with his apparent failure to follow up with the documents Logan had requested (Doc. 53-1 at 25).  Hayes never contacted the Bank about his difficulty procuring a bill of sale, even though he knew the Bank owned the plane (Doc. 53-1 at 21-22).  On April 22, Hayes picked up the plane from Lindner Aviation and flew it to Ohio, still without a bill of sale (Doc. 53-1 at 24; 55-17 at 71).

The Bank did not realize the plane was gone until May 15, when Hayes' counsel sent the Bank a letter alerting it that Hayes was filing with the FAA for registration of the plane (Doc. 55-11 at 2).  The Bank then emailed Crews to ask why the plane had been taken without authorization (Doc. 55-13 at 21).  Crews resurfaced in an email dated May 25, explaining for the first time that he thought he was authorized to sell the plane and confirming he was holding Hayes' money in escrow (Doc. 55-16 at 22–23).  The Bank formally rejected Hayes' offer during an emergency Board meeting on June 2 (Doc. 55-9 at 3; *see also* Doc. 55-16 at 48), and sent a letter to the FAA contesting Hayes' registration application the next day (Doc. 55-11).  The Bank never received payment for the plane (Doc. 53-2 at ¶ 18).  Hayes obtained a default judgment of $45,354.91 in this action against Crews and Skymaster Center (Doc. 22).

4

## CONCLUSIONS OF LAW

Hayes presents two claims to this Court: specific performance and fraudulent misrepresentation.  State Central Bank counterclaims for replevin of the plane.

### SPECIFIC PERFORMANCE

Hayes claims he became the plane's rightful owner through a legally binding contract, the Purchase Agreement.  Because the Bank did not sign the Purchase Agreement or otherwise agree to sell the plane, Hayes must show by a preponderance of the evidence that the Bank bound itself to the Purchase Agreement by authorizing Crews to sell the plane.  Hayes maintains the Bank did so and, in any event, failed to timely repudiate the sale.

"[A]n agent, acting within the scope of his actual authority, expressly or impliedly conferred, can bind the principal." *Damon's Missouri, Inc. v. Davis*, 63 Ohio St. 3d 605, 608 (1992).  Ohio law recognizes three ways an agent may bind a principal: (1) express authority; (2) implied authority; and (3) apparent authority.  *Master Consol. Corp. v. BancOhio Nat'l Bank*, 61 Ohio St. 3d 570, 574 (1991).

Express authority, as the name suggests, is established by "directly grant[ing] to or confer[ing] [authority] upon the agent or employee in express terms by the principal." *Id.*  "[I]t extends only to such powers as the principal gives the agent in direct terms." *Id.*  Implied authority derives from actual authority, as "unless its extent is otherwise expressly limited, implied authority carries with it the power to do all that which is reasonably necessary to carry into effect the power actually conferred." *Damon's Missouri*, 63 Ohio St. 3d at 608.

Logan, representing the Bank, contacted Crews to inquire about selling the plane.  Although Logan agreed to Crews' proposed commission, Logan did not agree to the proposed sale price and

5

in fact expressly requested that Crews wait to market the plane when it might attract a higher price (Doc. 53-4 at 2).   Whatever Crews' understanding of his relationship with the Bank, Logan's communications with Crews did not grant him actual authority to sell the plane at that time.

Nor did the Bank cloak Crews with apparent authority.  To show apparent authority sufficient to bind a principal, a plaintiff must prove:

> (1) [t]hat the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.

*Eaton v. Cont'l Gen. Ins. Co.*, 147 F. Supp. 2d 829, 834 (N.D. Ohio 2001) (quoting *Evans v. Ohio State Univ.*, 112 Ohio App. 3d 724, 744 (1996)).  Apparent authority depends on the conduct of the alleged principal, *not* the words or actions of the supposed agent.  *Id.*

Hayes argues Crews and Skymaster Center had authority to sell the plane because the plane was in Skymaster Center's possession and went through a two-day pre-buy inspection where it was taken apart.  This thorough inspection apparently gave Hayes confidence that Crews had authority to make the sale (Doc. 53-1 at 16).   But there is no record evidence supporting Hayes' belief that Skymaster Center possessed the plane.  The plane was stored at a hangar owned by Lindner Aviation, and Crews was never known to have even visited the airfield.  Again, apparent authority must be proven through the Bank's actions, not Crews'.  *Eaton*, 147 F. Supp. 2d at 834.

Hayes admits the Bank never directly represented that Crews or Skymaster Center had authority to sell the plane (Doc. 53-1 at 16).  In fact, Hayes did not even communicate with the Bank until *after* he had already paid for the plane in full and flown it to Ohio (Doc. 53-1 at 22).  Hayes points to Greg Gobble, who was allegedly told by Logan to work with Crews (Doc. 55-17 at 74-75).

6

Logan, for his part, denied saying anything of the sort to Gobble, but rather suggested Crews talk to Gobble to learn more about the plane (Doc. 58-1, Logan Dep. at 49–50). Even assuming Logan told Gobble to work with Crews, this fact, without more, cannot establish that Crews had apparent authority to sell the plane. At most, this is consistent with Logan telling Crews to get information on the plane and spread the word about a potential sale while waiting until the market improved.

Nor did the Bank knowingly permit Crews to act as if he had authority to sell the plane. Crews' dealings with Logan gave the Bank no reason to think Crews believed he had final sale authority -- at least until May 25, by which time the plane was long gone. While Hayes makes much of Crews' email that he would "get going on this" as proof the Bank knew Crews thought he had final sale authority, the more plausible reading is that he was responding to Logan's suggestion that Crews start spreading the word about a potential sale. And when Logan told Crews that any offer would have to go to the Bank's Board for approval, Crews replied that he understood as much (Doc. 53-8 at 2) -- this despite already having executed the Purchase Agreement. Hayes points to nothing Logan did or said that can bind the Bank.

As a last resort, Hayes claims the Bank ratified the Purchase Agreement by not timely repudiating the sale. A principal ratifies an unauthorized act by an agent if the "principal, with full knowledge of the facts, conducts himself in a way which manifests his intention to approve an earlier," non-binding act. *Bailey v. Midwestern Enters.*, 103 Ohio App. 3d 181, 185 (1995) (quoting *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 62 Ohio App. 3d 604, 611 (1989)).

Hayes signed the Purchase Agreement on April 2 (Doc. 53-5 at 4). Crews emailed Logan on April 3, identifying Hayes' interest and claiming he was "in a bind with [his] customer due to this misunderstanding" (Doc. 55-2 at 3). Crews, in an email dated April 7, explained that Hayes' offer

7

was very fair, but he understood Logan "ha[d] a board to deal with" (Doc. 53-8 at 2).  The next documented communication the Bank received about the plane was the May 15 letter from Hayes' counsel (Doc. 55-12 at 2).  It was only at this point that the Bank even arguably had full knowledge of the unauthorized sale.  The Bank then investigated the situation, scheduled an emergency Board meeting, and formally repudiated the sale within two-and-a-half weeks (Doc. 55-9 at 3).  Hayes' argument that the Bank did not repudiate the unauthorized sale within a reasonable time is meritless.

In short, Hayes seeks to avoid responsibility for trusting Crews' misrepresentations.  Hayes points out that Crews was an airplane broker and Hayes had no reason to doubt Crews could sell the plane.  But "[t]he party who deals with a known agent must not simply trust the agent's statements as to the extent of the agent's authority, but instead must use reasonable diligence and prudence to ascertain the true nature and extent of the agent's authority."  *Sorrell v. Micomonaco*, 2015-Ohio-1417, at ¶ 19 (Ct. App.) (citing *Ottawa Cty. Comm'rs v. Mitchell*, 17 Ohio App. 3d 208, 214 (1984)).  Hayes could have uncovered Crews' lack of authority in a number of ways, including contacting the Bank directly or asking Crews to see a broker agreement or bill of sale before paying full price.  Instead, he trusted that Crews had the authority Crews claimed.  That misplaced trust is not a substitute for a legally binding agreement.

### FRAUDULENT MISREPRESENTATION

Hayes also asserts a claim for fraudulent misrepresentation against the Bank.  While the Complaint and Hayes' Trial Brief (Docs. 1 & 53) are hard to nail down on this point, this Court discerns four principal misrepresentations asserted by Hayes: (1) Logan told Crews the Board met on April 4 to consider the sale of the plane, when there was no meeting on that date; (2) Logan and his son lied to the Board on June 2 when they told the Board Crews was only to appraise the plane, with

8

no contract between the Bank and anyone to sell the plane; (3) the Bank represented to the FAA that it was not a party to the Purchase Agreement; and (4) the Bank represented to this Court during motion practice that FAA registration determines aircraft ownership.  To succeed on a fraudulent misrepresentation claim, Hayes must prove:

> (1) a false representation, or the concealment of a material fact, made falsely; (2) knowledge of the falsity, or statements made with such recklessness that knowledge is inferred; (3) intent to mislead another into relying upon the representation or concealment; (4) justifiable reliance upon the representation or concealment; and (5) injury as a consequence of that reliance.

*Long v. Rice*, 2013-Ohio-2402, at 15 (Ohio Ct. App. 2006) (citing *Goddard v. Stabile*, 185 Ohio App. 3d 485 (2009)).

Notably, Hayes addresses these elements only for the first supposed misrepresentation -- that there was no Board meeting on April 4 (Doc. 55 at 54–55).  But even more fatally, none of these statements were made *to Hayes*, making their truth or falsity irrelevant.  Hayes could not rely on (or suffer injury from) statements he never heard.  And, in any event, he had already paid for the plane in full by the time any of these statements was allegedly made.  This claim fails too.

## REPLEVIN

The Bank brings a counterclaim for replevin of the plane under Ohio law.  To recover the plane, Ohio Revised Code § 2737.03 requires the Bank to show:

> (A) A description of the specific personal property claimed and the approximate value of each item or category of property claimed;
>
> (B) The specific interest of the movant in the property and, if the interest is based upon a written instrument, a copy of that instrument;
>
> (C) The manner in which the respondent came into possession of the property, the reason that the detention is wrongful and, to the best of the knowledge of the movant, the reason, if any, that the respondent may claim the detention is not wrongful;

(D) The use to which the respondent has put the property, as determined by the movant after such investigation is reasonable in the circumstances;

(E) The extent, if any, to which the movant is or will be damaged by the respondent's detention of the property;

(F) To the best of the movant's knowledge, the location of the property; [and]

(G) That the property was not taken for a tax assessment or fine pursuant to statute, or seized under the execution of judgment against the property of the movant or, if so seized, that it is statutorily exempt from seizure.

The Bank satisfies each of these requirements through the Affidavit of Bank President Michael Netland (Doc. 53-2).  Netland describes the property as a Cessna Skymaster C-337 airplane, worth approximately $45,000 (Doc. 53-2 at ¶ 7).  The Bank has an interest in the plane as the lawful owner with an original bill of sale and FAA registration.  (Doc. 53-2 at 6, 8).  Moreover, the parties agree the Bank "was the rightful and lawful owner of the Airplane at all times prior to the commencement of" the supposed sale to Hayes (Doc. 52 at ¶ 8).  The Bank claims Hayes took possession of the plane "by virtue of a legally defective agreement" between himself and Crews (Doc. 53-2 at ¶ 11).  As this Court has already determined, Crews lacked authority to sell the plane to Hayes, and Hayes never became the rightful owner of the plane.  His continued possession of the plane is necessarily wrongful.

The Bank also establishes that Hayes has flown the plane some 20–25 times since taking possession, but stopped flying because of this Court's Preliminary Injunction Order (Doc. 53 at 25; Doc. 53-1 at 27).  The plane is located at the Fremont Progress Airport in Fremont, Ohio, and should Hayes continue to possess the plane, the Bank would be damaged by continued depreciation of the plane and a reduced fair market value (Doc. 53-2 at ¶ 18).  In short, the Bank checks all the boxes required by Ohio law.

Hayes resists this conclusion in three ways.  First, he relies on his claim that he legally purchased the plane from the Bank, an argument this Court has already rejected.  Second, he briefly suggests he became the rightful owner as a buyer in the ordinary course of business according to UCC principles.  But a seller can convey to a buyer in ordinary course of business only the title he holds or the property he possesses.  *See* U.C.C. § 2-403(1)–(2).  Here, Crews held no title to the plane and the Bank never entrusted him with its possession.  Third, Hayes contends replevin should not be granted because the Bank has unclean hands, but cites no authority suggesting the equitable defense of unclean hands applies to a statutory replevin action under Ohio law.  Even if it did apply, Hayes does not describe misconduct by the Bank justifying application of the defense.

### CONCLUSION

The bad guy in this saga is Crews.  Hayes has a judgment against Crews and his company, Skymaster Central.  Hayes could have better protected his purchase by verifying the Bank's position.

For the reasons outlined above, this Court finds in favor of the Bank on the claims of specific performance and fraudulent misrepresentation; and further finds in favor of the Bank on its replevin action, directing Hayes to work with the Bank on the plane's timely return.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 3, 2015

11